# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Case No. 22-mj-370 (JFD)

| | | |
|---|---|---|
| STATE OF MINNESOTA | ) | |
| | ) ss. | AFFIDAVIT OF BRYAN LERVOOG |
| COUNTY OF RAMSEY | ) | |

I, Bryan Lervoog, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice, (hereinafter "ATF"), and is a United States investigative or law enforcement officer within the meaning of Title 18 United States Code Section 2510(7).

2.  Your Affiant has been employed as an ATF Special Agent since May 2014. I am authorized to conduct criminal investigations, make arrests, and obtain search warrants. In my capacity as an ATF Special Agent, my responsibilities include, but are not limited to, investigating federal firearms law violations under Title 18 and Title 26 of the United States Code. During these investigations, I have utilized many investigative methods to include de-briefing cooperating sources, conducting surveillance, and obtaining and executing search warrants. Your Affiant has assisted and/or led numerous federal and state investigators in conducting investigations of federal firearms law violations.

3.  This Affidavit is submitted in support of a criminal complaint charging Jay James OLSON (YOB 2001), with willfully engaging in the business of manufacturing firearms without a license, in violation of Title 18, United States Code, Sections

922(a)(1)(A) and 924(a)(1)(D), and knowingly possessing a machinegun, as defined by Title 26, United States Code, Section 5845(b), in violation of Title 18, United States Code, Sections 922(o)(1) and 924(a)(2).

4. The facts and information set forth in this Affidavit are based on Your Affiant's personal observations, training and experience, and information obtained from other law enforcement officers involved in the investigation. To the extent that any information in this Affidavit is not within Your Affiant's personal knowledge, it has been made available to Your Affiant through law enforcement personnel or other sources that are believed to be reliable and credible. This Affidavit is made for the sole purpose of demonstrating probable cause for the issuance of the criminal Complaint and does not purport to set forth all Your Affiant's knowledge of, or investigation into, this matter.

## PROBABLE CAUSE

1. The ATF is designated by law with regulatory power of firearms and the firearms industry. As part of that regulatory scheme, the ATF issues licenses to businesses and individuals registered with the ATF, authorizing them to manufacture and/or sell firearms for profit. Pursuant to 18 U.S.C. § 923, only a Federal Firearms Licensee ("FFL") is permitted to manufacture and/or sell firearms as a business. Pursuant to 18 U.S.C. § 922(a)(1)(A), it is unlawful for a person who is not an FFL (i.e., an ATF licensed manufacturer or dealer), to engage in the business of manufacturing and/or dealing in firearms.

2. With the advent of new and affordable technology (such as 3D printers) and equipment (such as compact numerical control, or CNC, milling devices), and the

importation of partially milled firearms parts and kits (often referred to as "80% receivers"), Your Affiant knows, based on his training and experience, that so-called "ghost guns," or "privately made firearms" ("PMFs"), or unserialized firearms, are fully functioning firearms regularly being illegally manufactured by unlicensed persons, who do not stamp the firearms with any identifying unique serial number, making the firearms almost impossible to trace to the original manufacturer or purchaser, and then unlawfully sold to others with no background check or paperwork that would normally accompany the sale of a firearm. According to the United States Attorney General, between January 2016, and December 2020, there were approximately 23,906 suspected PMFs reported to the ATF as having been recovered by law enforcement, including in connection with 325 homicides or attempted homicides. While in 2016, local law enforcement reported to ATF 1,750 suspected PMFs, by 2020, that number had grown to 8,712—an increase of over 400%. Additionally, Your Affiant knows, based on his training and experience, that so-called "switches," or "auto-sears," which are devices that are attached to the slide mechanism of a semiautomatic firearm, allowing the firearm to function as a fully automatic weapon (i.e., machinegun), with the single pull of a trigger, are also being readily manufactured using some of the new affordable technology and equipment referenced above.

3.  As part of this investigation, Your Affiant learned that during the month of April 2022, investigators with the Hennepin County Sheriff's Office (HCSO) and Hennepin County Violent Offender Task Force (VOTF), were investigating OLSON relating to the unlawful manufacture and/or sale of various firearms, including handguns,

assault rifles, and silencers, that did not have serial numbers imprinted on them as required by federal law. VOTF investigators learned from a confidential source (CS) that a white male, known to the CS as "J," was manufacturing and selling so-called "ghost guns," or unserialized privately made firearms. The CS informed investigators that J drove a black Audi, was associated with a specific residence on 7th Street in Waite Park, Stearns County, Minnesota, and used a specific cell phone number (ending in 4118) to facilitate sales of "ghost guns" in the Twin Cities area. The CS told investigators that J had communicated with the CS about firearm sales from the cell phone number (ending in 4118) the CS provided.

4.  Your Affiant learned that the CS had been arrested in early March 2022 for possession with intent to distribute approximately three kilograms of cocaine by a Hennepin County drug task force and was working and cooperating with law enforcement for consideration on pending charges. Your Affiant also learned that the CS had the following prior convictions: 2006 felony fifth-degree possession; 2006 felony flee police in motor vehicle; 2011 felony fifth-degree possession; and 2015 misdemeanor DWI.

5.  Investigators verified that the cell phone number ending in 4118 was listed with a "Jay James OLSON," who is a white male and the registered owner of a black Audi. Investigators showed the CS an unlabeled Minnesota DVS photo of OLSON, and the CS positively identified the DVS photo of OLSON as the person the CS knew as "J" and had informed investigators about. Investigators also learned that OLSON resided at a residence in Sauk Rapids, MN. Investigators learned that OLSON has pending criminal cases in Stearns County for a June 2021 felony second-degree assault with a dangerous weapon (a

firearm), felony second degree riot – being armed with a dangerous weapon (a firearm), and felony discharge of a firearm within a municipality, and in Mille Lacs County for an April 2022 fifth-degree possession of marijuana wax. As part of his conditions of release, the Stearns County District Court ordered in June 2021 that OLSON "shall not possess any firearms," and must surrender his firearms to the Stearns County Sheriff's Office within 48-hours of his release.

6. During the investigation, the CS sent investigators multiple pictures of firearms that OLSON was offering for sale, including what appeared to be Polymer-80-style ("P80") unserialized firearms and assault-rifle-style firearms. The CS also sent investigators a video the CS received from OLSON displaying various P80 and AR-15 style firearms.

7. During a meeting with the CS, the CS reviewed with investigators a recorded FaceTime video the CS had with OLSON during April 2022. During this approximate 9-minute FaceTime conversation, OLSON is displayed rolling a blunt, or marijuana cigar, handling apparent large buds of marijuana, and stating that he has gotten very high from smoking the marijuana. OLSON and the CS then discuss the potential sale of P80 PMFs and AR-style PMFs. OLSON told the CS that OLSON had 10 P80 PMFs and 3 to 4 fully auto AR-15 PMFs already built and ready to sell. OLSON also stated that he could have additional P80 PMFs to sell but that he needed to build them. OLSON stated that he manufactures his firearms at an autobody shop owned by the father of a friend of OLSON's, but that he can only go there after hours when the father is not at the body shop. OLSON told the CS that OLSON even manufactures his own gun barrels. OLSON told the CS that

OLSON had other customers that were asking for the PMFs he had built and was looking to sell them. OLSON also discussed installing an auto-sear switch on one of the P80 PMFs he built as part of the potential sale to the CS. The CS informed investigators that the videos were taken inside the specific residence located on 7th Street in Waite Park, Stearns County, that the CS had previously told investigators was associated with OLSON. OLSON also offered additional items for sale to the CS, including multiple high-capacity magazines, a brass catcher,[1] and other firearm-related items.

8. The CS also told investigators that the CS had known OLSON since about November 2021, and that they had met through a mutual friend in Saint Cloud. The mutual friend told the CS, in OLSON's presence, that OLSON had sold him a handgun. The CS stated that at the time the CS met OLSON through the mutual friend, OLSON was in possession of a Glock-style handgun. The CS further told investigators, that the CS had visited with OLSON at the 7th Street residence approximately four to five times since November 2021, and that each time they met, OLSON was in possession of a handgun.

9. The CS further told investigators that while at the 7th Street residence, the CS observed a large quantity of firearms, including Glock-style handguns and AR-style long rifles. The CS stated that OLSON told the CS that all the firearms present at the 7th Street residence were built by OLSON and that none of the firearms had serial numbers. OLSON told the CS that although it was illegal to have handguns without serial numbers, it was "safer" to have an unserialized handgun because it made it more difficult for law

---

[1] A "brass catcher" is a mesh implement that can be installed on the ejector-port of an AR-15 which catches the ejected cartridge casings as the firearm is discharged.

enforcement to track down the owner of that firearm. The CS also said that while at the 7th Street residence, OLSON discussed and showed the CS various firearms accessories, including silencers, extended drum-style magazines, and "switches."

10. OLSON told the CS that if the CS wanted to purchase one of the unserialized Glock-style firearms, the price would be $1,000, and for an unserialized AR-style long rifle, the price would be $3,000. OLSON later told the CS that the price respectively for each had increased to $2,000 and $5,000, because of President Biden's announcement to ban unserialized ghost guns, which made it "more dangerous" to possess and sell these types of firearms to OLSON's customers.

11. Investigators arranged to have the CS set up a controlled purchase from OLSON at the 7th Street residence for $20,000 worth of PMFs that OLSON built, including the 10 P80s OLSON referred to in the recorded FaceTime video, as well as any other PMFs and/or accessories that OLSON would be willing to sell to the CS. Investigators asked the CS to also discuss future sale transactions with OLSON for additional PMFs.

12. Prior to the controlled purchase, investigators drafted and obtained an anticipatory search warrant from Stearns County District Court, authorizing them to search the 7th Street residence once the controlled purchase of the various firearms and accessories was confirmed and made by the CS from OLSON.

13. On April 26, 2022, the day of the arranged controlled buy, investigators provided the CS with $20,000 in premarked and recorded U.S. currency, which was placed into a grey backpack. The CS was fitted with an audio-video recording device. Investigators followed the CS to the parking lot of the 7th Street residence in Waite Park.

Other investigators were already stationed in the parking lot to conduct surveillance. The CS parked in the parking lot and entered the residence.

14. Approximately 30 minutes later, investigators observed the CS and four other individuals (including OLSON) walk to the CS's vehicle in the parking lot, with one individual carrying a large black plastic tote-style container. The black plastic tote was placed into the CS's vehicle's rear hatch area. Investigators observed OLSON cover up the black tote with a sheet or blanket. The CS then grabbed the grey backpack containing the $20,000 in government buy funds from the CS's vehicle's front passenger seat, opened it and showed the money to OLSON. Once investigators observed OLSON take possession of the backpack containing the buy funds, they moved in, arrested all the individuals present, including the CS, and seized the black plastic tote. As investigators moved in to effect the arrest, OLSON threw the grey backpack with the buy funds into the rear hatch area of the CS's vehicle. The grey backpack with the government buy funds was also recovered.

15. Investigators then entered the 7th Street residence and executed the anticipatory search warrant of the one-bedroom apartment residence. From the black tote in the CS's vehicle's trunk, investigators seized the following, some of which are depicted in the below photograph of various seized evidence:



A. 9 empty high-capacity magazines, including 3 drum magazines, for P80-style firearms;
B. 2 pistol carbine-conversion kits;
C. 1 firearm silencer;
D. a brass-catcher;
E. 3 AR "ghost" assembled pistols with no serial numbers (2 with inserted high-capacity magazines not counted among the 9 in A);
F. 10 P80 PMF "ghost" assembled firearms with no serial numbers (in 5 boxes; 2 P80s each box);
G. 1 P80 PMF "ghost" assembled firearm with no serial number, with an installed switch making it a fully automatic firearm;

- H. 1 P80 PMF "ghost" assembled firearm with no serial number, with a threaded barrel (to enable screwing the firearm silencer onto it); and
- I. 1 P80 PMF "ghost" assembled firearm with no serial number.

16. During the search of the residence, investigators seized the following, some of which are depicted in the above photograph of various seized evidence:

- J. 2 loaded semiautomatic firearms in the bedroom / bedroom closet;
- K. 3 baggies containing over 200 grams of THC edibles in the kitchen;
- L. 3 jars containing approximately 98 grams of THC wax in the bedroom closet;
- M. a cardboard box in the bedroom containing 78 THC vape cartridges, THC wax, and 9 plastic baggies containing nearly 3.4 kilograms of marijuana;
- N. a cardboard box in the bedroom containing 500 THC vape cartridges and $200 cash;
- O. over $4100 cash from a safe in the bedroom;
- P. miscellaneous paperwork in the bedroom for P.B. and A.G.;
- Q. 3 P80 handgun lower assembly kits, from black plastic tote in kitchen;
- R. 4 AR lower receivers with no serial numbers, from black plastic tote in kitchen;
- S. 1 AR upper with a bolt, from black plastic tote in kitchen;
- T. 1 grey P80 assembled lower receiver with no serial number, from black plastic tote in kitchen;
- U. additional miscellaneous firearms parts and accessories, from black plastic tote in kitchen; and
- V. a blue container in the garage containing four baggies of marijuana totaling approximately 1.85 kilograms of marijuana.

17. Another loaded 9mm semiautomatic firearm was discovered and seized in a vehicle's center console that was associated with A.G. and the residence.

18. In a post-arrest debrief meeting between investigators and the CS, the CS told investigators that when the CS arrived at the residence parking lot, the CS called OLSON on OLSON's cell phone. OLSON let the CS into the apartment building and they walked together to and entered the apartment residence. When the CS entered the residence the CS saw two large black plastic tote-style containers in the kitchen area / floor. The CS

said that three other individuals, whom the CS had never seen before, were present inside the residence near the kitchen area when the CS entered.

19. The CS stated that OLSON opened one of the black totes and showed the CS the firearms and accessories that OLSON was going to sell to the CS as part of the arranged controlled buy. The CS looked inside each of 5 white cardboard boxes (depicted in above photograph as  ), inside the black tote and verified that each box contained two Glock-style handguns. The CS also saw at least two AR-style long rifles, drum-style magazines, a switch, and a silencer inside the black tote. OLSON showed the CS how to put a switch on one of the P80 firearms. One of the other individuals present reached inside the black tote, removed a firearm and manipulated it. OLSON told that individual to use a cloth and wipe down the firearm to remove the individual's prints from the firearm.

20. OLSON told the CS that OLSON believed he needed to "slow down" from the manufacturing and selling of unserialized firearms. OLSON told the CS that OLSON had manufactured and sold about 200 unserialized firearms over the last 8 months (which equates to between approximately September 2021 and April 2022). OLSON told the CS that OLSON had traveled to the Twin Cities Metro area in order to sell his unserialized firearms to "rappers" and other individuals unknown to the CS.

21. After reviewing the contents of the black tote with OLSON, OLSON asked the three others to help carry the black tote to the CS's vehicle.

22. The CS told investigators that after the black tote was placed inside the CS's vehicle, the CS grabbed the grey backpack containing the buy funds from the front passenger side of the CS's vehicle, removed the cash and showed it to OLSON. The CS

stated that OLSON smiled and appeared happy when the CS showed OLSON the cash. The CS stated that the CS set the backpack down with the cash inside it, and OLSON then picked up the grey backpack containing the cash. Shortly thereafter, investigators moved in and arrested everyone present. The CS stated that as investigators moved in yelling "police!", OLSON immediately threw the grey backpack into the CS's vehicle's rear-hatch area.

## CONCLUSION

23. Based on the information set forth above, Your Affiant has probable cause to believe that between approximately September 2021 and April 2022, Jay James OLSON, willfully engaged in the business of manufacturing firearms without a license, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 924(a)(1)(D), and that on or about April 26, 2022, Jay James OLSON knowingly possessing a machinegun, as defined by Title 26, United States Code, Section 5845(b), in violation of Title 18, United States Code, Sections 922(o)(1) and 924(a)(2).

Respectfully submitted,

Bryan Lenzoog
Special Agent, ATF

SUBSCRIBED and SWORN to before me,
by reliable electronic means (FaceTime and email),
pursuant to Fed. R. Crim. P. 41(d)(3), this
2nd day of May 2022,

JOHN F. DOCHERTY
UNITED STATES MAGISTRATE JUDGE