UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-158 (ECT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| JAY JAMES OLSON, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its position and memorandum on sentencing. For the reasons contained herein, the United States recommends a sentence of imprisonment of 60 months, the high-end of the applicable Guidelines range of 57 to 60 months, as a sentence that is sufficient, but not greater than necessary, to comport with the § 3553(a) sentencing factors.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

The United States agrees with, and incorporates by reference, the facts from the "Offense Conduct" section of the PSR, ¶¶ 7-20, as well as those facts from the Plea Agreement (ECF 35, ¶ 2).

Between at least the fall of 2021 and continuing through April 2022, the defendant willfully engaged in the business of manufacturing firearms without a license. The defendant devoted time, attention, and labor to manufacturing firearms with the principal objective selling the manufactured firearms for profit. The defendant has never been a federally licensed manufacturer of firearms.

During March and April 2022, the defendant negotiated and offered to sell various unserialized firearms he manufactured, (commonly known as "personally made firearms" or "PMFs" or "ghost guns"), as well as multiple other firearms and accessories, including a silencer, a machinegun conversion device ("MCD"), (commonly known as a "switch" or "auto-sear"), and high-capacity magazines, to a confidential source ("CS") working with police investigators, for $20,000 cash. The CS provided investigators with photos and FaceTime videos the defendant sent from his cellphone to the CS depicting multiple unserialized firearms and accessories the defendant offered for sale, including multiple Polymer 80 ("P80") Glock-style firearms, AR-style firearms, MCDs, a silencer, and multiple high-capacity magazines. The defendant also showed the CS large quantities of marijuana, touting its quality and potency, and indicated that he was smoking and selling the marijuana.

Investigators learned that the defendant at the time had pending criminal cases in Stearns County for a May 2021 felony second-degree assault with a dangerous weapon (a firearm), felony second degree riot – being armed with a dangerous weapon (a firearm), and felony discharge of a firearm within a municipality, (PSR ¶ 48), and in Mille Lacs County for an April 2022 fifth-degree possession of marijuana wax, (PSR ¶ 49). As part of his conditions of release, the Stearns County District Court ordered in June 2021 that the defendant "shall not possess any firearms," and must surrender his firearms to the Stearns County Sheriff's Office within 48-hours of his release. (PSR ¶ 20)

While the defendant was offering the firearms and accessories for sale to the CS, the defendant stated that he manufactures the firearms and even manufactures his own gun

barrels.  The defendant also told the CS that he had other customers that were asking for the PMFs he had built and was looking to sell them.  The defendant expressly told the CS that he would install an MCD or auto-sear switch on one of the P80 PMFs he built as part of the potential sale offer to the CS.  The CS told the defendant that the CS wanted all the firearms offered, especially switches, to sell to others.

The defendant touted the "benefits" of having firearms without serial numbers to the CS, such as making them harder to trace even though he acknowledged their illegality, and the defendant specifically noted that his price for the PMFs would be going up because of the federal government's recent initiative targeting unserialized firearms, and thereby making it more dangerous to possess and sell such firearms.

On April 26, 2022, the day of the arranged controlled buy, investigators provided the CS with $20,000 in pre-marked and recorded U.S. currency, which was placed into a backpack.  The CS was fitted with an audio-video recording device.  Investigators followed the CS to the parking lot of the residence associated with the defendant.  Other investigators were already stationed in the parking lot to conduct surveillance.

The CS met with the defendant inside the residence to effect the transaction.  The defendant provided the CS 16 PMFs, 9 high-capacity magazines, 1 silencer (made from an oil filter),[1] an MCD or switch, and other firearms accessories, which were all inside a black plastic tote.  Another plastic tote inside the residence contained additional firearms and firearm assembly kits.  The defendant asked a couple of associates to carry the black plastic

---

[1] The ATF verified that the silencer functioned and sufficiently dampened the sound of gunfire to meet the statutory definition of a silencer, and it confirmed the silencer was not registered, as required by federal law.

tote containing all the firearms and accessories to the CS's vehicle and put it in the trunk. In the parking lot by the vehicle, the CS handed the defendant the backpack containing the pre-marked $20,000 of buy money. Immediately after the exchange, investigators moved in and arrested the defendant and others present, seized the black tote, and recovered the backpack with the buy money.

Investigators then entered the one-bedroom apartment residence (which was being used in part as a tattoo parlor) and executed an anticipatory search warrant. From the black tote in the CS's vehicle's trunk, investigators seized the following, some of which are depicted in the below photograph of various seized evidence:



  A. 9 empty high-capacity magazines, including 3 drum magazines, for P80-style firearms;

  B. 2 pistol carbine-conversion kits;

  C. 1 firearm silencer;

  D. a brass-catcher;

  E. 3 AR "ghost" assembled pistols with no serial numbers (2 with inserted high-capacity magazines not counted among the 9 magazines in A.);

  F. 10 P80 PMF "ghost" assembled firearms with no serial numbers (in 5 boxes; 2 P80s each box);

  G. 1 P80 PMF "ghost" assembled firearm with no serial number, with an installed switch making it a fully automatic firearm;

  H. 1 P80 PMF "ghost" assembled firearm with no serial number, with a threaded barrel (to enable screwing the firearm silencer onto it); and

  I. 1 P80 PMF "ghost" assembled firearm with no serial number.

During the warrant-authorized search of the residence, investigators seized the following, some of which are depicted in the above photograph of various seized evidence:

  J. 2 loaded semiautomatic firearms in the bedroom / bedroom closet;[2]

  K. 3 baggies containing over 200 grams of THC edibles in the kitchen;

  L. 3 jars containing approximately 98 grams of THC wax in the bedroom closet;

  M. a cardboard box in the bedroom containing 78 THC vape cartridges, THC wax, and 9 plastic baggies containing nearly 3.4 kilograms of marijuana;

  N. a cardboard box in the bedroom containing 500 THC vape cartridges and $200 cash;

  O. over $4100 cash from a safe in the bedroom;

  P. miscellaneous paperwork in the bedroom for P.B. and A.G.;

  Q. 3 P80 handgun lower assembly kits, from black plastic tote in kitchen;

  R. 4 AR lower receivers with no serial numbers, from black plastic tote in kitchen;

  S. 1 AR upper with a bolt, from black plastic tote in kitchen;

  T. 1 grey P80 assembled lower receiver with no serial number, from black plastic tote in kitchen;

---

[2] These, as well as other items found in the bedroom, are believed to be associated with A.G.

U. additional miscellaneous firearms parts and accessories, from black plastic tote in kitchen; and

V. a blue container in the garage containing four baggies of marijuana totaling approximately 1.85 kilograms of marijuana.

Investigators debriefed the CS after the arrest and listened to the CS's audio-recording of the transaction. They learned that the defendant showed the CS how to install the MCD or switch on one of the P80 PMFs and converted it to a machinegun, and he told the CS that he had a source returning from Detroit with metal switches, which the defendant was planning to purchase. One of the other individuals present in the residence reached inside the black tote, removed a firearm, and manipulated it. The defendant told that individual to use a cloth and wipe down the firearm to remove the individual's prints from the firearm.

The defendant told the CS that the defendant needed to "slow down" from his manufacturing and selling of unserialized firearms. He told the CS that over the last 8 to 9 previous months, he had manufactured and sold about 170 to 200 unserialized firearms, but that he had gone to jail for a shooting the previous August, and had lost about $50,000, about 30 firearms, about 20 pounds of weed, and 6 pounds of wax. The defendant also told the CS that he had also traveled to the Twin Cities Metro area in order to sell his unserialized firearms to "rappers" and other individuals unknown to the CS. Finally, before carrying the black tote with the firearms and accessories to the CS's vehicle, the defendant told the others present that they would "smoke a blunt" afterwards and that he had one rolled up already.

On May 4, 2022, Investigators executed a search warrant at the defendant's residence in Sauk Rapids, MN, and recovered from



the basement a WEN-brand drill press, a box containing four AR10 / AR15 lower jigs,



various jig bolts and jig pieces, tooling end-mill instructions, a baggie



with hex wrenches (commonly found in jig kits) on top of a placemat diagramming how to assemble a Glock firearm, stickers for Polymer 80 and gun manufacturing companies, two unopened tubes of welding epoxy, and various indicia of the defendant's occupancy. Several of the jigs had metal shavings on them near holes that appeared to have been used for drilling.




Investigators also obtained and executed search warrants on the defendant's two cell phones and discovered additional evidence of firearms sales and trafficking and marijuana use and sales. (PSR ¶¶ 17-18)  During one text exchange in November 2021 with a person named "TWIGGZ," the person indicated they just "got hit in Wisconsin," which is reasonably inferred to mean charged in a criminal case.  In February 2022, the defendant

texted a photo of nine P80s and one P80 with an extended magazine and four high-capacity drum magazines to Twiggz.  When Twiggz asked for a "price," the defendant offered "all the straps" (i.e., firearms) at "9 a pop" (i.e., $900 each), and offered the "mags like 150 each," but noted he could work with bulk prices as well.  The defendant also stated he would "have ARs soon as well."  Twiggz later responded, "love my guns," but that he had to lay low because he was "not supposed to even be around a damn pocket knife."  The defendant replied, "On good same here."

The defendant's cell phones also contained multiple emails related to the purchasing of materials to manufacture firearms or accessories between February and April 2022, with shipping confirmations to the same address where investigators executed the warrant and discovered the drill press, manufacturing kits, and jigs.

In another video dated September 2021, which the defendant called his "Intro," the defendant appears to market his manufactured firearms and marijuana, while displaying a large stack of cash, which he states is $10,000.  The defendant states he's looking to do some business, and displays a large vacuum-sealed approximate gallon-sized bag of marijuana buds, AR-15 style firearms, upper and lower receivers, P80 firearms, and a silencer.

   

In July 2022, a grand jury returned a three-count Indictment, charging the defendant with willfully engaging in the business of manufacturing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) and 924(a)(1)(D), which carries a statutory maximum term of 5 years' imprisonment (Count 1); possession of a machinegun, in violation 18 U.S.C. §§ 922(o)(1) and 924(a)(2), which carries a statutory maximum term of 10 years' imprisonment (Count 2); and possession of an unregistered firearm (i.e., the silencer), in violation of 26 U.S.C. §§ 5681(d) and 5871, which carries a statutory maximum term of 10 years' imprisonment (Count 3). (PSR ¶¶ 1, 85, 87; ECF 18)

On September 28, 2022, the defendant pleaded guilty to willfully engaging in the business of manufacturing firearms without a license, (Count 1), in accord with a plea agreement filed with the Court. (PSR ¶¶ 2-4; ECF 34, 35)

On February 10, 2023, the United States Probation Office issued its Final PSR, finding the defendant's total offense level to be 25 and his criminal history category to be I,[3] resulting in an effective advisory Guidelines' range of 57 to 60 months' imprisonment, because of the statutory maximum. (PSR ¶¶ 36, 45, 86; USSG § 5G1.1(c)(1)) The PSR's Guidelines calculations did not differ from those contemplated by the plea agreement. (PSR ¶¶ 2, 88; ECF 35, ¶¶ 5.f.)

## **ARGUMENT**

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable

---

[3] The PSR determined that the defendant had one criminal history point. (PSR ¶ 45)

Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."  *Id.* at 49-50.  Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."  18 U.S.C. § 3553(a).  But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence."  *United States v. Wisecarver*, 911 F.3d 554, 557 (8th Cir. 2018); *United States v. Ballard*, 872 F.3d 883, 885 (8th Cir. 2017); *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

### A.    <u>The Guidelines Calculations</u>

The United States agrees with the calculated total offense level of 25 and criminal history category of I, resulting in an effective Guidelines range of 57 to 60 months' imprisonment, given the statutory maximum sentence.

The defendant, however, objects to two Guidelines calculations.  First, the defendant objects to the base offense level being 20 (under USSG § 2K2.1(a)(4)(B)), because he claims being a unlawful user of a controlled substance is purportedly unconstitutionally vague since a person must assess "whether at a particular moment in time they are a

'prohibited person' due to past or present use of a controlled substance."  (PSR Add. A.3, ¶ 3)  Second, the defendant objects to the four-level increase under USSG § 2K2.1(b)(5) for trafficking of firearms, because he claims there are insufficient facts to establish that he intended to transfer two or more firearms to a prohibited person or that he knew or had reason to believe that the CS or another of his customers was a prohibited person as required by the Guidelines enhancement.  (PSR Add. A.5, ¶ 4) The facts in the PSR, and the facts admitted to in the plea agreement, as corroborated by the evidence discussed above and to be proffered at the sentencing hearing, however, readily show by a preponderance of the evidence that the defendant was an unlawful user of a controlled substance in and around the time he possessed multiple firearms and that he trafficked in firearms within the meaning of the Guidelines enhancement.  Accordingly, as found by the PSR, the base offense level is properly 20, and the four-level enhancement is warranted.

    1. _Unlawful user in possession_

In support of his objection to being an unlawful user in possession of firearms, the defendant cites and relies on _United States v. Bramer_, 832 F.3d 908, 909 (8th Cir. 2016), for the proposition that it is "plausible" that the term "unlawful user" could be constitutionally vague, even though _Bramer_ rejected the constitutional challenge where there was sufficient evidence of the defendant's use of marijuana while in knowing possession.  (PSR Add. at A.4)  In any event, as discussed below, several Eighth Circuit decisions since _Bramer_ have sustained convictions based on being an unlawful user of marijuana in possession of a firearm, (on even less evidence than in the present case) making the dicta of _Bramer_ of no import.

The defendant also cites *United States v. Carnes*, 22 F.3d 743, 748 (8th Cir. 2022), *reh'g denied*, No. 20-3170, 2022 WL 540599 (8th Cir. Feb. 23, 2022), and *cert. denied*, 143 S. Ct. 370 (2022), to support his assertion that the defendant's use of marijuana is insufficient to establish a specific temporal nexus between regular use and his unlawful possession of firearms.  (PSR Add. at A.4)  But "[t]he government is not required to prove that the defendant possessed the firearm while contemporaneously using a controlled substance. *United States v. Mack,* 343 F.3d 929, 933 (8th Cir.2003). It is sufficient for the government to demonstrate use of a controlled substance 'during the period of time' that the defendant possessed firearms, not that there was actual use 'at the time that the officers discovered [the defendant] in possession of firearms.' *Id.*" *United States v. Rodriguez*, 711 F.3d 928, 937 (8th Cir. 2013).  Moreover, the *Carnes* court "reject[ed] [the defendant's] expansive interpretation of 'regular drug use' that would require evidence of use over an extended period. While some of our sister circuits require proof that a defendant used controlled substances regularly over an extended period, . . . we declined to adopt such a rigorous definition."  *Carnes*, 22 F.4th at 749.

In *United States v. Glinn*, 863 F.3d 985, 989 (8th Cir. 2017), the court rejected a sufficiency-of-the-evidence claim based on the words of the defendant alone that he was occasionally using marijuana.  "At the time of the traffic stop, Glinn told the officer that he was now on a 'straight path,' and he would 'chill' with his girl—'eat, chill, do a little smokin', I ain't gonna lie to ya, I smoke, I chill, hang with my girl, and I stay off the street.' The officer testified at sentencing that he concluded from Glinn's comments that he was

talking about marijuana, not cigarettes." *Id.* The court concluded that "[t]his evidence, alone, support[ed] the district court's base offense level determination under clear error review" that the defendant was an unlawful user of marijuana in possession of a firearm, under the applicable Guidelines provision.

More recently, in *United States v. Banks*, 43 F.4th 912, 918-19 (8th Cir. 2022), the Eighth Circuit rejected a claim of insufficient evidence to sustain a verdict of being an unlawful user of marijuana in possession of a firearm on significantly less evidence of marijuana use than in the present case, which the court deemed constituted "substantial evidence." In *Banks*, the defendant told an officer during a traffic stop that "he had some 'smoke' and retrieved a baggie of marijuana from the Altima's glove compartment. Once detained, Banks admitted he 'had a little bit of marijuana.'" *Id.* at 919. The officer also "observed marijuana crumbs throughout the car, and discovered a used blunt and methamphetamine elsewhere in the cabin. The government also presented the images of apparent marijuana on Banks's cellular phone, and a video that showed him smoking a blunt in the rental car two days before the stop." *Id.* The court concluded that a reasonable jury could readily have found that the defendant was an unlawful user of a controlled substance and sustained the conviction. *See id.*

If the substantially less significant evidence of temporal marijuana use in the above cases warrant a base offense level for being a prohibited person as an unlawful user of marijuana under the Guidelines, then certainly the substantially more significant evidence of the defendant's temporal marijuana use in the present case warrants no less. Accordingly, the PSR properly determined the base offense level to be 20. (PSR ¶ 26)

2. _Trafficking in firearms enhancement_

The defendant next claims that there is insufficient evidence that the defendant engaged in trafficking firearms within the meaning of USSG § 2K2.1(b)(5). The government is seeking an evidentiary hearing and will offer the testimony of the case agent in further support of this enhancement. But as the PSR correctly found, there is sufficient evidence the defendant knew or had reason to believe his conduct would result in the transport, transfer, or disposal of a firearm to an individual who intended to use or dispose of the firearm _unlawfully_. (PSR Add. at A.5) (emphasis added).

> A defendant engaged in the trafficking of firearms if he:
>
> (i) transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and
>
> (ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—
>
> (I) whose possession or receipt of the firearm would be unlawful; or
>
> (II) who intended to use or dispose of the firearm unlawfully.

_United States v. Pepper_, 747 F.3d 520, 525 (8th Cir. 2014) (quoting USSG § 2K2.1, cmt. n.13).

In _Pepper_, the defendant, among other things, transferred an unregistered machinegun to another person. _Id._ Because 26 U.S.C. § 5861(d) proscribes the receipt and possession of certain firearms, including machineguns, absent proper federal registration, the Eighth Circuit found the firearms-trafficking enhancement applied in part based on the second prong that the person intended to use or dispose of the firearm unlawfully. _Id._ The court reasoned that because the machinegun that Pepper transferred

to the other person was not registered, it made the other person's "possession of it necessarily unlawful." *Id.* Accordingly, the court found that the district court did not err in applying the trafficking-in-firearms enhancement. *See id.*

Similarly, in *United States v. Lomax*, 910 F.3d 1068, 1070 (8th Cir. 2018), the defendant's transfer of an unregistered automatic weapon and a grenade, in violation of 26 U.S.C. § 5861(d), created "circumstances known to Lomax at the time of the sale, [that] he had reason to believe that the source intended to use the weapons unlawfully." *Id.* The court reasoned that "[t]his fact alone rendered possession of the weapon by both Lomax and the confidential source 'necessarily unlawful.'" *Id.* (quoting *Peppers*, 747 F.3d at 525). Additionally, the court noted that "the nature of the sale was clandestine," which therefore supported an inference of unlawful intent. *Id.* (noting that defendant and confidential source "exchanged $1,000 in cash for unregistered, highly dangerous, military-style weapons that were concealed in a tool case. Based on the nature of the weapons and the circumstances under which they were exchanged, Lomax had reason to believe that the confidential source, *whose mere possession of the weapons was unlawful*, also intended to use the weapons unlawfully.").

Under a preponderance of the evidence, the trafficking-in-firearms enhancement equally applies here for the same reasons. The defendant sold an unregistered silencer and an unregistered machinegun to the CS, among other firearms that the defendant touted as supporting unlawful purposes because they were hard to trace, for $20,000 cash, that were concealed in a plastic tote. The mere possession of the unregistered silencer and machinegun by the CS was unlawful, which provides ample support to reasonably infer by

a preponderance of the evidence that the defendant had reason to believe that the CS also intended to use the weapons unlawfully.  The holdings and reasoning of the *Pepper* and *Lomax* decisions readily supports the application of the trafficking-in-firearms enhancement.

Additionally, the defendant knew that the CS intended to transfer the firearms the defendant was selling to the CS to others who were seeking switches under clandestine and suspicious circumstances, thereby affording the defendant a "common-sense inference[]" that the CS "intended to use or dispose of the firearm[s] unlawfully."  *See United States v. Whitaker*, 633 F. App'x 104, 105 (4th Cir. 2015) (permitting reliance on "common-sense inferences drawn from circumstantial evidence when determining applicability of a § 2K2.1(b)(5) enhancement."); *see id.* ("While there was no direct evidence that Whitaker knew that the purchasers planned to use or dispose of the firearms unlawfully, we conclude that the court did not clearly err by inferring from the totality of the circumstances that Whitaker had reason to believe that the purchasers' intentions with the firearms were not lawful.").

Moreover, the CS was not the defendant's only customer who provided the defendant with a reasonable basis to believe would use the firearms he was selling unlawfully.  The defendant's offer to sell Twiggz nine to ten P80s with extended drum magazines, where Twiggz expressly told the defendant that he was prohibited from even being near "a damn pocketknife," also provided the defendant with reason to believe that Twiggz "intended to use or dispose of the firearm[s] unlawfully."  Accordingly, the PSR properly applied the four-level enhancement for trafficking-in-firearms.

16

After properly applying the base offense level and the specific offense characteristic enhancements, the PSR properly calculated total offense level of 25 and criminal history category of I, resulting in an effective Guidelines range of 57 to 60 months' imprisonment.

For the following reasons, the United States advocates for a sentence of 60 months' imprisonment, as a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2). The United States also advocates for a supervised-release term of three years, with conditions that include having the defendant and his premises and property subject to search on reasonable suspicion of contraband or other violation of his supervised-release terms. The United States further advocates for a recommendation of the RDAP drug-treatment program and mental health assessment and treatment while the defendant is incarcerated with the BOP.

**B.**     **The 3553(a) Factors**

A consideration of the 3553(a) factors warrants a sentence of 60 months' imprisonment.

1.     Nature and Circumstances of the Offense

Even while charged with multiple felonies involving assaultive use and illegal discharge of a firearm, and while under court order to "not possess any firearms," and to surrender his firearms to law enforcement within 48-hours of his release, the defendant willfully engaged in unlicensed manufacturing of unsearialized firearms and an unregistered silencer, possession of an unregistered machinegun, and engaged in unlawful trafficking of firearms under clandestine circumstances for significant amounts of cash. While the defendant claims ad-hoc that his statements of manufacturing and selling nearly

200 PMFs were mere puffery, the totality of the circumstances and the defendant's intimate knowledge of, ready access to, and possession of multiple PMFs, assembly kits, and manufacturing tools, readily implies otherwise.  The circumstances surrounding his felony charges of unlawful use of a firearm in Stearns County also counter the defendant's belated claim of braggadocio.  Rather, it appears from the totality of the circumstances and the overwhelming evidence that the defendant was willfully engaged in significant unlicensed manufacture, sale, and trafficking of untraceable PMFs, machinegun conversion devices, unregistered silencers, and AR-style weapons, all while using and possessing self-admitted large quantities of high-grade marijuana.  The nature and circumstances of the offense warrants a sentence of 60 months' imprisonment.

No doubt too that the defendant's manufacture and trafficking in PMFs contributed significantly to the rise in crime and use of PMFs, which make law enforcement of gun crimes substantially more difficult to prosecute.  According to the Attorney General's Office, between January 2016 and December 2020, there were approximately 23,906 suspected PMFs reported to the ATF as having been recovered by law enforcement, including in connection with 325 homicides or attempted homicides.  While in 2016, local law enforcement reported to ATF 1,750 suspected PMFs, by 2020, that number had grown to 8,712—an increase of over 400%.

While the defendant's criminal history is relatively minimal, he must still be held accountable for his willfully committed crime.  A sentence of 60 months' imprisonment is warranted—especially given that the defendant gained the benefit of pleading to a five-

year statutory maximum count, rather than either of the other two ten-year statutory maximum counts.

### 2.   History and Characteristics of the Defendant

The United States submits that the PSR accurately and adequately describes the defendant's criminal history, personal history, and characteristics. Although only 22 years old, the defendant appears to be on a path of significant felonious behavior, including use and sale of large quantities of high-grade marijuana combined with felonious manufacturing, use, and trafficking of firearms.

To the defendant's credit he has voluntarily participated in a mental health therapy program since July 2022, and completed a six-week psycho-education group with dual behavioral therapies. No doubt the defendant could benefit from structured programming and educational opportunities, substance abuse treatment, and mental health treatment while incarcerated at BOP and when placed on supervised released. The defendant appears to be at a significant cross-roads in his life, with two possible yet quite divergent paths. It is hoped that he will obtain the necessary assessment and treatment he needs, accept sobriety and lawful behavior, be successful on supervised release following his release from BOP, and become a productive member of society—leaving the path of crime and drug use.

### 3.   Needs of Sentencing and Other 3553(a) Factors

A sentence of 60 months is also warranted by the needs of sentencing and other § 3553(a) factors. While certainly some mitigating factors exist, such as the defendant's lack of education, no contact with his biological father, struggle with school and bullying,

somewhat dysfunctional upbringing, and perhaps misdiagnosed mental health issues, the defendant was nevertheless raised in a generally good environment with a caring family, and no prevalence of physical violence or abuse in his home, and with adequate financial support. But aggravating factors also warrant consideration such as the very serious nature of the offense and the incredibly negative impact the offense has very likely had on the skyrocketing levels of gun violence experienced over the last few years. A sentence of 60 months will provide adequate deterrence for the defendant as an individual, and to others by showing that unlicensed manufacturing (and trafficking) of untraceable firearms is a serious felony crime. *See Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

On balance, a sentence of 60 months would serve the needs of sentencing to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to avoid unwarranted sentencing disparities among defendants.

## <u>CONCLUSION</u>

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 60 months' imprisonment and a three-year term of supervised release, including conditions of substance abuse treatment, mental health treatment, and

requiring the defendant and his residence be subject to search upon reasonable suspicion of contraband or other supervised-release violation.

Respectfully submitted,

Dated:  March 6, 2023

ANDREW M. LUGER
United States Attorney

/s/ *Benjamin Bejar*

BY:  BENJAMIN BEJAR
Assistant United States Attorney
Attorney ID No. 351131